1
2
3
4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

5
6
7

EDWARD "TY" GRAHAM,

Plaintiff,

8

v.

9

CINGULAR WIRELESS LLC,

10

Defendant.

11
12

NO.  C05-1810JLR

ORDER

13

## I.  INTRODUCTION

14      This matter comes before the court on a motion for summary judgment (Dkt. # 48)

15   from Defendant Cingular Wireless LLC ("Cingular") and Plaintiff Edward "Ty" Graham's

16   motion for a continuance pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  For

17   the reasons stated below, the court GRANTS Cingular's motion in part and DENIES it in

18   part; the court also GRANTS Mr. Graham's motion for a 56(f) continuance with respect to

19   his defamation and false light invasion of privacy claims, and DENIES the motion with

20   respect to the remaining claims.

21                          ## II.  BACKGROUND

22   **A.      Mr. Graham's Employment at Cingular.**

23      Mr. Graham was a long-time employee of Cingular and its predecessors.  In 1990, he

24   began working for McCaw Cellular.  Meo Decl., Ex. C (Graham Dep. at 10).  A few years

25
26   ORDER- 1

later, AT&T Cellular purchased McCaw Cellular, which was eventually sold to Cingular in 2004. <u>Id.</u> Mr. Graham's employment remained stable during all but the final buyout of his division by Cingular. <u>Id.</u> At the time Cingular purchased AT&T Cellular, Mr. Graham was working for an Indian subsidiary of the company called IDEA. <u>Id.</u> at 12. IDEA is a wireless cell phone company in India. <u>Id.</u> From 2004 until Cingular sold the division in 2005, IDEA was a joint venture between it and two other large Indian companies, Birla and Tata. Tuvim Decl., Ex. A (Graham Dep. at 131-132). Mr. Graham was the Director of International Operations and on the Board of Directors of IDEA. <u>Id.</u> at 253. Although Mr. Graham did not reside in India, for the past 12 years he regularly commuted from Seattle to India to oversee the IDEA entity. Meo Decl., Ex. C (Graham Dep. at 33-34).

In June 2005, Mr. Graham learned that Cingular intended to liquidate its international holdings because it wanted to concentrate on its United States operations. <u>Id.</u> at 32. Bill Hague, Mr. Graham's immediate supervisor, informed Mr. Graham that Cingular's plan included liquidating its interest in IDEA. <u>Id.</u> at 33-35. Mr. Graham was then asked to assist Cingular in identifying potential purchasers for its interest in IDEA. Once Cingular sold its interest, Mr. Hague informed Mr. Graham that his position would be eliminated and that he had the choice of moving to Atlanta, Cingular's headquarters, or seeking alternative employment. <u>Id.</u> at 33-35; 50-51.

**B.   Mr. Graham Assists in the Negotiations and Eventual Sale of Cingular's IDEA Interest.**

Shortly after purchasing shares in IDEA in 2004, Cingular began looking for a potential buyer of its interest. In preparation to sell its shares, Cingular organized a team of consultants and executives to value its interest in IDEA, contact potential buyers, and manage the negotiations. Graham Decl. at ¶ 1. The team members included consultants from an investment banking firm, attorneys from Freshfields, a London based law firm, Lonnie

ORDER- 2

1  Rosenwald, an attorney and a vice president for Cingular, Sean Foley, the Treasurer and head

2  of Corporate Development for Cingular, and Mr. Graham.  Id. at ¶ 2.  The team tried to meet

3  via teleconference on a regular basis, usually once a week, to discuss the status of the sale of

4  Cingular's interest in IDEA.  Id. at ¶ 6.  Ms. Rosenwald was the "team leader" and managed

5  the day-to-day activities for the team.  Id. at ¶ 5.  Ms. Rosenwald's supervisor, Sean Foley,

6  oversaw her activities.  Id.  Mr. Graham was not the lead negotiator, nor did he have any

7  signature authority for Cingular.  Id.

8         In December 2004, Cingular entered into an agreement to sell its interest in IDEA to a

9  company the parties refer to as SST/TMI for $202 million.  Graham Decl. at ¶ 3.  The deal

10  with SST/TMI eventually fell through, however, because SST/TMI failed to obtain the

11  necessary regulatory approvals.  Id.  The team continued to search for a potential buyer.

12  Subsequent bids for Cingular's interest in IDEA ranged from $200 million from a Russian

13  group to $217 million from Cingular's partners, Tata and Birla.  Meo Decl., Exs. K-M.

14         In June 2005, a company called India Televentures Limited ("ITL"), through its owner

15  C. Sivasankanra ("Siva"), made an offer of $255 million for Cingular's IDEA interest.  Tuvim

16  Decl., Ex. U; Meo Decl. Ex. C (Graham Dep. at 130-132).  Shortly after Siva conveyed the

17  offer to Cingular's team, however, some team members became concerned that Siva's offer

18  triggered Tata's and Birla's right of first refusal ("ROFR").  Id.  The members expressed

19  concern that if they did not convey Siva's offer to Tata and Birla, Cingular would be exposed

20  to costly and time-consuming litigation.  Id.  In response to these concerns, Siva agreed to

21  increase his offer to $300 million to offset the risk of litigation.  Id.  Despite Siva's $45

22  million increase, however, the team determined that the best course of action was to afford

23  Tata and Birla their ROFR.  Siva was skeptical of the team's decision.  Specifically, he was

24  concerned that Cingular was using ITL as a "stalking horse" to negotiate a more favorable

25  deal from Tata and Birla.  Id.  As a result of this skepticism, Siva negotiated a $45 million

26  ORDER- 3

break fee from Cingular; that is, if Tata and Birla exercised their ROFR and purchased Cingular's interest, Cingular would owe Siva $45 million, as compensation for the lost deal. Id.  The $45 million number was not arbitrary; it represented the amount Siva increased his offer when faced with the Tata and Birla ROFR.  Id.; Meo Decl., Ex. D (Foley Dep. at 45). Lonnie Rosenwald communicated Siva's offer, including the $45 million break fee, to her supervisor Sean Foley during the week of July 18, 2005.  Foley Dep. at 44-47.  Mr. Foley approved of the transaction and told Ms. Rosenwald that if she wanted to pursue the Siva transaction she should go ahead and put a deal together for board approval.  Id.

On July 22, 2005, Ms. Rosenwald, Siva, and Mr. Graham met at the Four Seasons Hotel in Seattle, Washington to finalize ITL's bid for Cingular's interest in IDEA.  Meo Decl., Ex. C (Graham Dep. at 132-136).  During this meeting. the parties entered into a Memorandum of Understanding ("MOU") that obligated Siva to purchase Cingualr's IDEA interest contingent on the ROFR.  Id.  The MOU included the $45 million break fee.  Id. Once Siva and Ms. Rosenwald signed the MOU, Ms. Rosenwald left the meeting.  Id.  Mr. Graham and Siva then entered into an employment agreement, wherein Mr. Graham would continue to operate IDEA for another one of Siva's companies.  Id.  Although Mr. Graham and Siva had previously negotiated the terms of the employment agreement, Mr. Graham was not comfortable signing it until Cingular and ITL finalized the MOU.  Id.  As discussed below, the employment agreement contained a one-time signing bonus of $1 million for Mr. Graham.

On July 25, 2005, ITL and Cingular entered into the final Share Purchase Agreement ("Purchase Agreement") that superceded the prior MOU.  Meo Decl., Ex. P; Tuvim Decl., Ex. U.  In the Purchase Agreement, ITL agreed to buy Cingular's interests in IDEA for $300 million, with a $45 million break fee should Tata and Birla exercise their ROFR.  Id.  Shortly

ORDER- 4

1   thereafter, Cingular's Board of Directors approved the Purchase Agreement, including the $45

2   million break fee.  Meo Decl., Ex. P.

3        The following day after the Purchase Agreement was finalized, Cingular wrote to its

4   partners, Tata and Birla, to inform them of the offer and give them the opportunity to acquire

5   Cingular's IDEA interest at the same price and terms and conditions as offered by ITL.  Meo

6   Decl., Ex. V.  In this letter, Cingular represented to Tata and Birla that it was including all

7   material terms and conditions of ITL's offer for their review.  Id.  Yet, Cingular did not

8   inform its partners that the ITL offer included a $45 million break fee if Tata and Birla

9   exercised their ROFR.  Id.  In fact, prior to writing to Tata and Birla, Cingular's managers

10  discussed whether Tata and Birla would take the position that the ITL deal was for $255

11  million, not $300 million, based on the $45 million break fee, and thereby lessen their match

12  price.  Meo Decl., Ex. D (Foley Dep. at 78-79).  The Cingular managers ultimately made the

13  decision not to inform the partners of the break fee.  Id.  Ms. Rosenwald, at the direction of

14  Mr. Foley, drafted a second agreement between Cingular and ITL that did not include the $45

15  million break fee and enclosed this second agreement for Tata's and Birla's review.  Graham

16  Decl. at ¶ 12.

17       Within a week of communicating the offer to Tata and Birla, both companies agreed to

18  match ITL's offer of $300 million for Cingular's interest in IDEA.  Meo Decl., Exs. Z and

19  AA.  Tata and Birla separately notified Cingular that they were matching the offer with the

20  understanding that they had been given all material terms and conditions of the ITL offer.  Id.

21  Cingular then notified ITL that the Purchase Agreement was no longer effective and it was

22  selling its interest to Tata and Birla.  ITL responded by increasing its offer to $400 million.

23  Tuvim Decl., Ex. A (Graham Dep. at 123-124).  Cingular rejected the increase and continued

24  to take steps to close the Tata and Birla deal.  Id.  Once Cingular informed Siva that it was

25

26  ORDER- 5

1  rejecting his offer, ITL, through Siva, demanded that Cingular pay the $45 million break fee

2  to ITL.

3      In an October 10, 2005 letter to ITL, Mr. Foley responded to ITL's collection activities

4  by declaring the Purchase Agreement void or voidable at Cingular's option.  Tuvim Decl., Ex.

5  T.  According to Mr. Foley, the agreement and the $45 million break fee was unenforceable

6  because it was entered into as a "result of breaches of duties of fidelity and trust owed to

7  Cingular by Lonnie Rosenwald and Ty Graham."  Id.  The only stated basis for Mr. Foley's

8  assertion that the Purchase Agreement was unenforceable was the $1 million signing bonus

9  paid to Mr. Graham.  Id.  Mr. Foley also informed Siva that the matter was under

10 investigation by the Fraud Division of the King County District Attorney's Office.  Id.  The

11 District Attorney's Office took no action in the matter.  Cingular and ITL eventually settled

12 their dispute in or about January 2006.  Tuvim Decl., Ex. U.  In the Settlement Agreement,

13 Cingular agreed to pay ITL a substantially reduced break fee of $3.5 million.  Id.

14     On August 12, 2005, Cingular's Board of Directors expressed concern over the way

15 the original agreement with ITL had transpired.  Meo Decl., Ex. CC.  Specifically, it was

16 concerned that the execution of the Purchase Agreement did not follow the proper procedures

17 established for agreements in excess of $50 million.  Id.  The Board then ordered an

18 investigation into the process failures, as well as the $45 million break fee, and directed that

19 the investigators report back to the Audit Committee of Cingular to take the necessary

20 disciplinary actions.  Id.

21 **C.    Mr. Graham's Employment Agreement with Siva.**

22     On June 23, 2005, when it looked as if Siva was going to purchase Cingular's interest

23 in IDEA, Siva offered Mr. Graham a position on the Board of Directors of Aircel

24 Televentures Limited ("ATVL"), the company that would be responsible for the IDEA

25 operations.  Meo Decl., Ex. I.  The employment offer included a $500,000 annual

26 ORDER- 6

compensation and a one-time joining bonus of $1 million.  Id.  Upon receipt of Siva's offer, Mr. Graham contacted a lawyer, Rusty Holmes, for advice on how to proceed with the offer while remaining employed at Cingular.  Meo Decl. Ex. C (Graham Dep. at 111-112).  Mr. Graham testified that Mr. Holmes advised him that it would not pose a conflict of interest for Mr. Graham to accept the offer.  Id.  Mr. Holmes based his advice on the fact that Cingular already informed Mr. Graham to find new employment and that it appeared Mr. Graham was assisting Cingular in obtaining the best deal for its IDEA shares and was not harming Cingular in any way.  Id.

On July 26, 2005, after some negotiation over the employment offer, Mr. Graham signed an employment agreement with ATVL.  Tuvim Decl., Ex. G.  The agreement provided that Mr. Graham would become a Director for ATVL with a monthly salary of $33,300 and another $60,000 per month for expenses.  Id.  The new agreement also included the one-time signing bonus of $1 million.  Id.  Unlike the previous June 2005 offer, however, the new agreement provided that the $1 million, once paid, was not refundable.  Id.  That is, if the Cingular/ITL deal fell through and Siva was no longer in need of Mr. Graham's services, Mr. Graham would retain the $1 million.  Id.  On July 26, 2005, Siva wired $1 million to Mr. Graham's account "as per employment agreement."  Tuvim Decl., Ex. H.

**D.  Cingular Terminates Mr. Graham's Employment.**

In mid-August 2005, having been charged by Cingular's Board of Directors to investigate the ITL negotiations, Cingular hired a computer forensic consultant to image and search Mr. Graham's computer hard drive.  Second Tuvim Decl., Ex. CC (O'Connor Dep. at 41, 73-77).  The search produced copies of correspondence between Mr. Graham and Siva, as well as a copy of Mr. Graham's employment agreement with ATVL.  On September 7, 2005, two Cingular representatives, John O'Connor, in-house counsel for Cingular, and Geoff Oletti, Chief of Security for Cingular, interviewed Mr. Graham regarding his employment

ORDER- 7

agreement with Siva.  Graham Decl. at ¶ 15.  During the meeting, Mr. Graham admitted that he entered into an employment agreement with Siva and that he had already received a $1 million signing bonus.  Id.; Meo Decl., Ex. DD.  Mr. Graham also claims that Mr. O'Connor accused Mr. Graham of signing the MOU with Siva without Ms. Rosenwald's knowledge or participation.  Graham Decl. at ¶ 15.  Ms. Rosenwald and Siva are the only signatories to the agreement, however.  Id.  Mr. Oletti then asked Mr. Graham to submit a written explanation of his actions regarding the employment agreement and informed Mr. Graham that Cingular was terminating his employment due to his violation of Cingular's Code of Business Conduct ("CBC").  Meo Decl., Ex. DD.

Approximately a month prior to his termination for violating the CBC, Bill Hague called Mr. Graham and "they agreed" that Mr. Graham's severance would begin on September 15, 2005.  Meo Decl., Ex. C (Graham Dep. at 74-75).  Cingular terminated Mr. Graham's employment on September 7, just days before his severance period was to commence.  As a result of Mr. Graham's termination prior to being laid off by Cingular, Mr. Graham did not qualify for severance or bonus benefits.  Id. at 51-52.

**E.** **Mr. Graham Deposits the $1 Million Bonus in an Escrow Account Pending the Resolution of this Dispute.**

Immediately after terminating Mr. Graham's employment, Cingular sought disgorgement of his $1 million signing bonus.  As a result of Cingular's threats of litigation, and at the advice of his attorney, Mr. Graham agreed to place the $1 million bonus, plus interest, in an escrow account.  Tuvim Decl., Ex. R.  In exchange for Mr. Graham's agreement to relinquish his bonus, Cingular agreed not to file a motion for a temporary restraining order freezing Mr. Graham's personal bank accounts.  The parties further agreed that the money would remain in the escrow account until this dispute is resolved.  Id.  The

ORDER- 8

1  agreement specifically provides that the money can only be withdrawn with written

2  authorization from both Mr. Graham and Cingular, or at the direction of the court.  Id.

3        Mr. Graham asserts eight state law claims arising out of this dispute:  (1) tortious

4  interference with contractual relationship; (2) conversion and replevin; (3) defamation and

5  false light invasion of privacy; (4) breach of employment agreement and the covenants of

6  good faith and fair dealing; (5) wrongful withholding of wages; (6) misrepresentation and

7  promissory estoppel; (7) unjust enrichment; and (8) declaratory judgment.  This court

8  previously dismissed Mr. Graham's tortious interference claim (Dkt. # 38).

9        Cingular counter claimed against Mr. Graham based on what it considered Siva's bribe

10  to Mr. Graham of $1 million in return for an exorbitant break fee if the Cingular/ITL deal fell

11  through.  Def.'s Answer at ¶¶ 95-96.  Cingular asserts various counterclaims all of which are

12  based on Mr. Graham's alleged breaches of his fiduciary duties.  Cingular now moves for

13  summary judgment on all of Mr. Graham's remaining claims.[1]

14                          **III.  DISCUSSION**

15        In resolving this motion for summary judgment, the court must draw all inferences

16  from the admissible evidence in the light most favorable to the non-moving party.  Addisu v.

17  Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate

18  where there is no genuine issue of material fact and the moving party is entitled to a judgment

19  as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden to

20  demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477

21  U.S. 317, 323 (1986). When the moving party meets its burden, the opposing party must show

22  that there is a genuine issue of fact for trial.  Matsushita Elect. Indus. Co. v. Zenith Radio

23  Corp., 475 U.S. 574, 586 (1986).  The opposing party must present significant and probative

24  _____

25        [1]Cingular does not move for summary judgment on any of its counterclaims.

26  ORDER- 9

1   evidence to support its claim or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952

2   F.2d 1551, 1558 (9th Cir. 1991).  For purely legal questions, summary judgment is

3   appropriate without deference to the non-moving party.

4   **A.      The Court Grants In Part Mr. Graham's Motion for a Rule 56(f) Continuance.**

5             Mr. Graham requests that the court grant him continuance of Cingular's summary

6   judgment motion until discovery is complete pursuant to Rule 56(f) of the Federal Rules of

7   Civil Procedure.  Rule 56(f) permits an opposing party to a summary judgment motion to

8   request that the court either dismiss the motion or grant a continuance to permit it time for

9   additional discovery.  Id.  Such requests must be supported by an affidavit that explains what

10  additional facts are needed and how these facts will create a genuine issue of material fact.

11  10B Fed. Prac. & Proc. Civ. 3d § 2740; Ashton-Tate Corp. v. Ross, 916 F.2d 516, 520 (9th

12  Cir. 1990).  Where the opposing party demonstrates that it needs additional discovery to

13  respond to a summary judgment motion, the court has wide discretion to deny summary

14  judgment or grant additional time for the non-moving party to conduct discovery.  Fed. R.

15  Civ. P. 56(f); Burlington N. & Santa Fe R.R. Co. v. The Assiniboine, 323 F.3d 767, 773-74

16  (9th Cir. 2003).  Courts grant motions for continuances "almost as a matter of course unless

17  the non-moving party has not diligently pursued discovery of the evidence."  Burlington, 323

18  F.3d at 774 (quoting Wichita Falls Office Assoc. v. Ban One Corp., 978 F.2d 915, 919 n.4

19  (5th Cir. 1992)).

20            Rule 56(f) requires that the opposing party file a declaration explaining the need for

21  additional discovery.  Here, Mr. Graham's counsel, Leslie J. Hagin, properly filed a lengthy

22  declaration explaining his need for additional discovery.  Ms. Hagin's declaration more than

23  meets the standard for a continuance under Rule 56(f).  According to Ms. Hagin, Cingular has

24  (1) produced redacted materials from deponent's files, without providing a privilege log; (2)

25  refused to produce the report created by John O'Connor, the Cingular investigator who

26  ORDER- 10

oversaw Mr. Graham's termination – Cingular refuses to produce the report even though Mr. O'Connor testified that he reviewed it prior to his deposition; (3) refused to make the person who authorized his termination available for a deposition; (4) refused to make other Cingular employees, who have knowledge relating to the $45 million break fee and other matters, available for depositions; and (5) yet to produce the attachments to a number of relevant emails and redacted others without providing a privilege log. Hagin Decl. at ¶¶ 3-19. The court also notes that pending before it is Mr. Graham's motion to compel much of the additional discovery discussed above.

For these reasons, the court grants Mr. Graham's Rule 56(f) motion as it relates to his defamation and false light invasion of privacy claims. With respect to the remaining claims, the court finds that no additional discovery is needed and that the determination of these claims is ripe for summary judgment.

**B.**   **Whether Mr. Graham Breached His Fiduciary Duties to Cingular is Not Properly Decided on Summary Judgment.**

As a threshold issue, Cingular contends that "Graham's admitted breaches of his duty of disclosure and undivided loyalty to his employer . . . defeats every one of the claims he brings here." Def.'s Mot. at 9. In fact, Cingular spends about a fourth of its briefing addressing this issue. First, there is nothing in the record that supports Cingular's assertion that Mr. Graham "admitted" to committing any breach of his fiduciary duty to Cingular. In fact, Mr. Graham adamantly denies that any of his actions conflicted with his duties to Cingular. Mr. Graham even cites to the advice from his counsel that he received prior to entering into any agreement with Siva as evidence that he did not breach his duty to Cingular. Second, Cingular has not moved for summary judgment on its counterclaims, which are based on Mr. Graham's alleged breaches of his fiduciary duties to Cingular. The court therefore will not comment on the strength of Cingular's contention that all of Mr. Graham's claims fail

ORDER- 11

1   because he breached his duties to Cingular, other than to note that the issue is fraught with

2   material factual disputes and therefore not ripe for summary dismissal.

3   **B.      ERISA Does Not Preempt Mr. Graham's Claims.**

4          Cingular also contends that all of Mr. Graham's state law claims are preempted by the

5   Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001-1461.

6   Cingular's argument is based on a very narrow reading of Mr. Graham's Amended Complaint.

7   According to Cingular, Mr. Graham's claims are preempted because an element of his damage

8   request is the recovery of COBRA benefits under Cingular's Benefits Plan, as well as a claim

9   for severance and benefits under its Severance Plan.  Cingular asserts that both plans are

10  employee welfare benefits plans subject to ERISA.  Cingular's sole support for its preemption

11  claim is paragraph 3.18 of Plaintiff's Amended Complaint.[2]  Paragraph 3.18 alleges, in part,

12  "Defendant has wrongfully terminated plaintiff.  There was no cause or proper justification

13  for defendant's termination of plaintiff.  In wrongfully terminating plaintiff, withholding his

14  wages in the form of severance and bonus compensation, and in its other actions set forth

15  herein, defendant has breached its agreement(s) with plaintiff and the covenants of good faith

16  and fair dealing implicit therein."  Am. Compl. at ¶ 3.18.  Cingular reads this averment as Mr.

17  Graham's claim that Cingular terminated him to avoid payment of benefits to him under the

18  severance plan.  Even assuming for purposes of this motion that Cingular's plans are ERISA

19  benefits plans, paragraph 3.18 of the Amended Complaint, when read in context of Mr.

20  Graham's entire Amended Complaint, does not support Cingular's argument.

21         Section 1144 (a) of ERISA provides that its provisions "shall supersede any and all

22  State laws insofar as they may now or hereafter relate to any employee benefit plan" covered

23  ─────────────────

24         [2]Cingular cites to Plaintiff's original Complaint in its motion for summary judgment.  Plaintiff
    filed his Amended Complaint almost nine months before Cingular brought this motion.  The court

25  assumes Cingular meant to cite to the Amended Complaint and thereby does the same.

26  ORDER- 12

by ERISA.  29 U.S.C. § 1144(a).  Congress intended the ERISA preemption clause to be applied in broad categories of cases that "relate to" an employee benefit plan.  See Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138-139 (1990) ("Its deliberately expansive language was designed to establish pension plan regulation as exclusively a federal concern.") (internal quotations and citations omitted).  A state law claim relates to an employee benefit plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." Id. (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983)).  The preemptive power of ERISA, however, has its limits.  In Shaw, the Court noted that "some State actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." 463 U.S. at 100.

In determining whether a wrongful discharge claim is preempted by ERISA, the court looks to the alleged motivation in terminating the employee.  See Ingersoll Rand, 498 U.S. at 140; Ethridge v. Harbor House Rest., 861 F.2d 1389, 1405 (9th Cir. 1988).  If the employee alleges that his employer had a "pension-defeating" motivation in terminating his employment, then the claim relates to ERISA and is therefore preempted.  Ingersoll Rand, 498 U.S. at 140.  If, however, the employee alleges that the loss of his pension benefits was merely a consequence of his wrongful termination then his claim is not preempted by ERISA. Ethridge, 861 F.2d at 1405; see also Karambelas v. Hughes Aircraft Co., 992 F.2d 971, 974 (9th Cir. 1993).  In Karambelas, the plaintiff, a former in-house attorney for the company-defendant, claimed that defendant terminated his employment because it needed a "scapegoat" for a serious legal error.  992 F.2d at 974.  During plaintiff's deposition, however, plaintiff also claimed that another reason for his termination was that the company probably wanted to avoid the vesting of his pension rights.  Id.  Despite this admission, the Ninth Circuit held that the "heart and soul of the complaint is Karambelas' outrage at the fact that he was a scapegoat . . . .  His complaint does mention that he was terminated just before his retirement benefits

ORDER- 13

1    vested, but that was clearly in the nature of a jeremiad . . . ."  Id.; see also Ethrirdge, 861 F.2d

2    at 1405 (holding that the loss of ERISA benefits was a result of, rather than a motivation for,

3    a wrongful discharge, and consequently there was no cause of action under ERISA).

4         Mr. Graham's Amended Complaint does not allege that Cingular terminated his

5    employment in order to avoid paying him severance and COBRA benefits.  Rather, Mr.

6    Graham alleges that the loss of his benefits was a consequence of his wrongful discharge.  In

7    paragraph 2.19, Mr. Graham states that Cingular terminated his employment and made false

8    and disparaging statements about him "in an effort to create an 'excuse' for not paying the

9    break fee it agreed to pay [Siva] regarding the IDEA transaction."  Pl.'s Am. Compl. ¶ 2.19.

10   The court is not persuaded by Cingular's interpretation of the allegations contained in Mr.

11   Graham's Amended Complaint.[3]

12        In its reply brief, Cingular argues an alternative theory for its contention that Mr.

13   Graham's state law claims are preempted.  Cingular argues the claims are preempted because

14   they involve a determination of his eligibility for benefits under the Cingular Severance and

15   COBRA plans.  Def.'s Reply at 16 (citing New York State Conference of Blue cross & Blue

16   Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 657 (1995) and Egelhoff v. Egelhoff, 532

17   U.S. 141, 148 (2001)).  Neither case cited by Cingular, however, supports its preemption

18   argument.  The Court in Travelers and Egelhoff confronted state laws that facially conflicted

19   with ERISA.  For example, in Egelhoff, the Court held that the Washington statute

20   automatically revoking a former spouse's designation as a plan beneficiary was in conflict

21   _____

22        [3]In fact, the court is troubled by the degree to which Cingular's counsel mischaracterizes Mr.
     Graham's complaint.  In its reply brief, Cingular's counsel goes too far when it baldly pronounces that
23   "Graham *expressly* alleges in his Amended Complaint that he was terminated to avoid the payment of
     severance benefits to him."  Def.'s Reply at 15 (emphasis added) (citing to paragraph 3.18 of the
24   Amended Complaint for support of its statement).  In paragraph 3.18, Mr. Graham alleges that, in
     wrongfully terminating him and withholding his severance and bonus, Cingular breached its
25   employment agreement with him.  There is no allegation that Cingular terminated him in order to
     avoid paying severance and a bonus.

26   ORDER- 14

with ERISA's requirement that benefits be paid out only to those identified in the plan documents. 532 U.S. at 146. Cingular argues that the court's determination of whether Mr. Graham was terminated for cause or "otherwise qualified for benefits thereunder" is a determination of eligibility for plan benefits and therefore preempted by ERISA. This argument requires the court to stretch the bounds of ERISA preemption beyond its logical framework. Here, Mr. Graham is not suing for enforcement of a State law that, on its face, conflicts with ERISA, nor does he appear to claim that Cingular discharged him to avoid paying severance and bonus benefits. The gravamen of Mr. Graham's complaint is that Cingular discharged him wrongfully so that it could avoid paying a $45 million break-fee. Mr. Graham's claims are not dependent on the interpretation or enforcement of an employee benefits plan. Accordingly, the court finds the <u>Karambelas</u> and <u>Ethridge</u> cases instructive on this issue, and concludes that Mr. Graham's state law claims are not preempted by ERISA.

**C.    Cingular Did Not Unlawfully Deprive Mr. Graham of his Signing Bonus.**

Mr. Graham claims that Cingular wrongfully took possession of his $1 million signing bonus by threatening financial ruin and criminal prosecution. While it is evident from the pleadings that Cingular threatened to seek a temporary restraining order freezing Mr. Graham's bank accounts, the court is not persuaded that these actions amount to constructive conversion or a valid replevin claim.

In Washington, the tort of conversion is "the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." <u>Consulting Overseas Mgmt., Ltd. v. Shtikel</u>, 18 P.3d 1144, 1147 (Wash. Ct. App. 2001) (quoting <u>Washington St. Bank v. Medalia Healthcare L.L.C.</u>, 984 P.2d 104, 105-106 (Wash. Ct. App. 1999)). When a valid dispute exists concerning the title to personal property, possession can be lawfully denied for as long as reasonably necessary to determine

ORDER- 15

1    the rightful owner.  <u>Paris Am. Corp. v. McCausland</u>, 759 P.2d 1210, 1215 (Wash. Ct. App.

2    1988).

3         Here, Cingular persuaded Mr. Graham to transfer his $1 million signing bonus, plus

4    interest, to an escrow account.  Mr. Graham was represented by counsel during these

5    negotiations and, with the advice of counsel, agreed to transfer the money until the dispute

6    was resolved.  Under the terms of the agreement the parties entered into prior to the transfer

7    of the $1 million, the money cannot be released unless both parties consent or the court issues

8    an order.  Accordingly, the court finds that Cingular does not have sole possession of the

9    signing bonus and cannot therefore be liable for conversion.  Moreover, Cingular claims a

10   right to the money under an agency theory.  That is, because Mr. Graham benefitted from the

11   breach of his fiduciary duties to Cingular, Cingular is entitled to the proceeds of his breach,

12   i.e., the signing bonus.  While the court questions the strength of Cingular's claim to the

13   money, there exists a valid dispute that precludes Mr. Graham's claim for conversion.  The

14   court finds no inequity in Mr. Graham's counseled decision to place the funds in equity.

15   Accordingly, the court will dismiss Mr. Graham's conversion and replevin claims.[4]

16   **D.    Cingular Has Not Been Unjustly Enriched.**

17        Mr. Graham also contends that his placing the $1 million in an escrow account unjustly

18   enriched Cingular.  The court finds that Cingular has not been "enriched" by the $1 million,

19   nor was Mr. Graham's decision to place the signing bonus in an escrow account "unjust."

20   Unjust enrichment occurs when one retains money or benefits that in justice and equity

21   belong to another.  <u>Bailie Commc'ns v. Trend Bus. Sys. Inc.</u>, 810 P.2d 12, 18 (Wash. Ct. App.

22

23   _____

24        [4]An action for replevin is a statutory claim under Washington law.  Mr. Graham has not met
     any of the requirements for a replevin action and therefore his claim will be dismissed.  The court
25   notes, however, that even if Mr. Graham asserted a proper replevin action, it would fail for the same
     reasons his conversion claim fails.

26   ORDER- 16

1    1991).  An unjust enrichment claimant must establish that (1) he conferred a benefit on the

2    defendant; (2) the defendant appreciated or knew of the benefit; and (3) the defendant's

3    acceptance or retention of the benefit under the circumstances make it inequitable for the

4    defendant to retain the benefit without paying its value.  Id. (citations omitted).  It is the third

5    element that Mr. Graham fails to meet.  Even viewing the evidence in the light most favorable

6    to Mr. Graham, the court finds no support for the claim that the parties' agreement to place

7    the disputed signing bonus in an escrow account amounts to unjust enrichment.  The court

8    likewise dismisses this claim.

9    **E.      Mr. Graham's Testimony Does Not Support a Claim for Breach of Contract.**

10           Cingular moves to dismiss Mr. Graham's breach of contract claim because he was an

11   at-will employee and therefore had no guarantee of employment through the date of his

12   anticipated job elimination.  Although Mr. Graham acknowledged in his deposition that he

13   presumed that he was an at-will employee, he claims that in mid-August Bill Hague promised

14   that Cingular would employ him for a defined period of time (September 15, 2005 through

15   November 15, 2005), after which he would collect severance and other benefits.  Meo Decl.,

16   Ex. C (Graham Dep. at 73; 74:6-75:2).[5]  Specifically, Mr. Graham testified that in mid-August

17   "Bill Hague called me, and we agreed that the 15th would be the day that my severance would

18   start.  And in the - in the intervening time I received the COBRA package."  Id.  Mr. Graham

19   contends that Mr. Hague's "specific" promise created and express contract binding on

20   Cingular.

21

22           [5]Cingular cites to Mr. Graham's deposition to support its argument the Mr. Graham admitted
     that his employment at Cingular was at-will.  The court is unable to verify this statement in the
23   deposition cites provided by Cingular.  See Def.'s Supp. Mot. at 4 (citing Tuvim Decl., Ex. A
     (Graham Dep. 67-69)).  The court notes that there are a number of deposition cites in Cingular's brief
24   that do not support its assertions.  See e.g., Def.'s Supp. Mot. at 4 (cite to Graham Dep. at 237); Id.
     at 2 (cite to Graham Dep. at 141); Id. at 3 (cites to Graham Dep. at 104, 107 and 165).
25

26   ORDER- 17

1    Under Washington law, employment of an indefinite duration is at-will, meaning the

2    employer may terminate the employee any time, with or without cause.  Bulman v. Safeway,

3    Inc., 27 P.3d 1172, 1174 (Wash. 2001).  Employers and employees may contractually modify

4    the relationship, however, through the creation of an equitable claim "where the employer

5    makes promises of specific treatment in specific situations, thus precluding the enforcement

6    of the at-will aspect of the employment agreement."  Kuest v. Regent Assisted Living, 43

7    P.3d 23, 29 (Wash. Ct. App. 2002).  Mr. Graham cites to Winspear v. Boeing Co., 880 P.2d

8    1010 (Wash. Ct. App. 1994) for the proposition that an employer's oral promise can create an

9    express contract.  In Winspear, the employee was terminated when Boeing learned that he had

10   committed a misdemeanor offense.  Id.  The court held that the employer's statement to the

11   employee that, if he pleaded guilty to a misdemeanor, he would not lose his job, was

12   insufficient to create an enforceable agreement.[6]  The oral promise at issue in this matter is far

13   less definite than the one rejected in Winspear.

14        Here, according to Mr. Graham's own testimony, the only agreement he had with Mr.

15   Hague was that the 15th would be the date that his severance would begin.  Mr. Hague did not

16   make a promise of specific treatment in a specific situation, only that if Mr. Graham receives

17   severance it would begin on September 15th.  The court finds unpersuasive Mr. Graham's

18   argument that based on Mr. Hague's vague statement regarding the start date for severance,

19   _____

20        [6]Mr. Graham also cites to an Ohio case for the proposition that an employer's oral promise to
     provide severance to its employees if they work until the plant closed creates an enforceable contract.

21   See Helle v. Landmark, Inc., 472 N.E.2d 765, 772-777 (Ohio Ct. App. 1984).  In Helle, the
     employer's agents made statements to the employees such as, "don't quit you have a lot of severance

22   coming," and that they were working on "severance pay" for you, so don't quit.  Id.  The Ohio court
     held that the employees justifiably relied on these statements and continued to work until the plant

23   closed.  Id.  This created an enforceable agreement and the employees were entitled to their severance
     pay.  The case currently before the court is quite distinguishable from the circumstance before the

24   Ohio court.  Mr. Graham does not allege any exchange wherein Cingular promised to pay him
     severance if he stayed until it sold its IDEA interest.

25

26   ORDER- 18

that Cingular was therefore bound to "only fire Mr. Graham for a serious breach of the duty

of loyalty or a material breach of contract." Pl.'s Opp'n at 27.  While the determination of

whether an employer made a specific promise to the employee is a question of fact, the court

holds that no reasonable juror could find that Mr. Graham had an employment agreement with

Cinguar that precluded it from terminating his employment before September 15th.

Additionally, the severance plan applicable to Mr. Graham provides that severance

benefits are not available to an employee terminated for any reason other than "a reduction in

force or other organizational or business change resulting in the elimination of your position."

Hill Decl., Ex. 1 at 7.  The plan also provides that, in order to qualify for benefits, "you must

receive a written notice from Cingular Wireless that your position will be eliminated due to a

reduction-in-force or other business or organization change." Id.  There is no dispute that Mr.

Graham's termination was not the result of a position elimination, but rather Cingular's belief,

however implausible Mr. Graham may find it, that Mr. Graham committed serious ethical

violations during his negotiations with Siva.  Moreover, Mr. Graham admitted that he did not

receive written notice that Cingular was eliminating his job.  Tuvim Decl., Ex. A (Graham

Dep at 75).  Pursuant to the plain language of the severance plan, Mr. Graham did not qualify

for severance benefits and Mr. Hague's representation in mid-August was not sufficient to

alter express contractual language in the plan or the very nature of Mr. Graham's at-will

employment status.[7]

---

[7]For the same reasons Mr. Graham's breach of contract claim fails, so does his claim for breach
of the duty of good faith and fair dealing.  A duty of good faith and fair dealing cannot be implied
where the contract at issue is an at-will employment agreement, which by its very terms has no
restrictions on the employee or the employer.  See Thompson v. St. Regis Paper Co., 685 P.2d
1081,1086 (Wash. 1984) ("while an employer may agree to restrict or limit his right to discharge an
employee, to imply such a restriction on that right from the existence of a contractual right, which, by
its terms has no restrictions, is internally inconsistent").

ORDER- 19

1    Similarly, Mr. Graham's claim that Cingular violated state wage laws by wrongfully

2    withholding his severance and bonus payments fails.  As an initial matter, the court questions

3    whether Mr. Graham has a civil remedy under the two Washington criminal statutes he plead

4    in his Amended Complaint, RCW §§ 49.48.010 and 49.52.050.  See Keenan v. Allan, 889 F.

5    Supp. 1320, 1378 (E.D. Wash. 1995) (questioning whether a Washington court would permit

6    plaintiff's action seeking recovery of wages under RCW 49.48.010 and 49.52.050).  The court

7    need not resolve this issue, however, because even assuming such a claim is permitted under

8    Washington law, there is no evidence that supports Mr. Graham's contention that Cingular

9    owed him severance and bonus payments.  In fact, Cingular has produced a number of

10   documents that show that Mr. Graham did not qualify for either severance or a bonus

11   payment.

12   In sum, Mr. Graham has not come forth with sufficient evidence to convince the court

13   that there is a genuine issue of material fact as to whether he was entitled to these payments.

14   The only evidence Mr. Graham offers this court is his own testimony that in mid-August "Bill

15   Hague called me, and we agreed that the 15th would be the day that my severance would

16   start.  And in the - in the intervening time I received the COBRA package."  As stated above,

17   the court finds that this evidence does not support Mr. Graham's claim for entitlement to

18   severance or a bonus payment.  The court therefore grants Cingular's motion for summary

19   judgment on Mr. Graham's breach of contract claim.  For the same reasons, the court

20   dismisses Mr. Graham's wrongful withholding of wages claim.

21   The court is mindful of Mr. Graham's request for a Rule 56(f) continuance.  In this

22   matter, however, the court relies solely on Mr. Graham's sworn testimony as evidence of

23   whether Cingular promised to pay Mr. Graham severance and a bonus.  In addition to his

24   sworn deposition testimony, Mr. Graham also submitted a lengthy declaration in opposition to

25   Cingular's motion for summary judgment.  In all of this testimony, the only support for Mr.

26   ORDER- 20

Graham's claim for breach of contract and wrongful withholding of wages is the cite to Mr. Graham's testimony that the severance period would start on the 15th. The court finds that this evidence does not create a genuine issue for trial.

**F.     Mr. Graham Fails to Come Forth With Evidence That Supports His Detrimental Reliance and Promissory Estoppel Claims.**

Mr. Graham contends that the mid-August statement by Mr. Hague gives rise to a claim for promissory estoppel/detrimental reliance. Washington courts apply five elements to determine if there is a viable promissory estoppel claim: "(1) a promise, (2) that promisor should reasonably expect to cause the promisee to change his position, and (3) actually causes the promisee to change his position, (4) justifiably relying on the promise, (5) in such a manner that injustice can be avoided only by enforcement of the promise." Klinke v. Famous Recipe Fried Chicken, Inc., 616 P.2d 644, 646 (Wash. 1980) (citations omitted). Here, even assuming Mr. Hague's statement was a promise, which the court already determined it was not, the comment was made in mid-August, just weeks before the end of Mr. Graham's employment with Cingular. Mr. Graham offers this court no evidence, or even argument, that he did anything to change his position in reliance on Mr. Hague's statement that severance would begin on September 15th. Mr. Graham simply does not raise an issue of fact as to his theories of promissory reliance, such that this claim should be put before a jury. Accordingly, the court dismisses these claims.

**G.     There is No False Statement to Support Mr. Graham's Claim For Negligent Misrepresentation.**

In evaluating a claim for negligent misrepresentation, Washington uses the standard from the Restatement (Second) of Torts:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information,

ORDER- 21

1    if he fails to exercise reasonable care or competence in obtaining or
2    communicating the information.

3    See Elliott Bay Seafoods, Inc. v. Port of Seattle, 98 P.3d 491, 495 (Wash. Ct. App. 1994)

4    (citing RESTATEMENT (SECOND) OF TORTS § 552(1) (1997)).  A claim for negligent

5    misrepresentation requires the plaintiff to prove by clear, cogent, and convincing evidence,

6    that the defendant made a false statement.  Id.  Once again, Mr. Graham supports his claim by

7    citing to Mr. Hague's statement that his severance period would begin on the 15th.  Mr.

8    Graham fails entirely in his opposition brief to explain how this statement, if made, was a

9    false statement.  There is no evidence before the court that could possibly support, by a clear,

10   cogent, and convincing standard, a claim that Mr. Hague's statement, when made in mid-

11   August, was not true.  There is no evidence that, at the time Mr. Hague made the statement,

12   he knew of Mr. Graham's prior dealings with Siva or that he knew Mr. Graham's employment

13   would be terminated prior to the beginning of his severance period.  Moreover, the court

14   holds, as with Mr. Graham's promissory estoppel claim, that there is no evidence that Mr.

15   Graham justifiably relied on Mr. Hague's statement, as required for a negligent

16   misrepresentation claim.  The court likewise dismisses Mr. Graham's claim for negligent

17   misrepresentation.

18   **H.     The Court Continues Argument on Mr. Graham's Claims for Defamation and
          False Light**.

19          Mr. Graham's claims for defamation and false light are based, in part, on statements

20   Mr. Foley made in an inflammatory letter sent to Siva on October 10, 2005.  Tuvim Decl., Ex.

21   T.  In the letter, Mr. Foley accuses Mr. Graham of breaches of duties of fidelity and trust, and

22   further accuses him of being involved in a conspiracy to defraud Cingular.  Id.  Mr. Foley also

23   implies in the letter that Mr. Graham accepted a $1 million bribe in return for binding

24   Cingular to an agreement to pay a $45 million break fee to Siva.  Id.  Both a claim for

25   defamation and false light require as an element of proof that Cingular's statements about Mr.

26   ORDER- 22

1   Graham were false.  See Guntheroth v. Rodaway, 727 P.2d 982, 984 (Wash. 1986) (citations

2   and quotations omitted) (holding that the first element of defamation is falsity); Eastwood v.

3   Cascade Broadcasting Co., 722 P.2d 1295, 1297 (Wash. 1986) (stating that the second

4   element of a false light claim is that the actor knew of or negligently disregarded the falsity of

5   the publication).  Mr. Graham argues convincingly that additional discovery is needed to

6   determine the falsity of Cingular's statements and the extent to which Cingular published

7   these statements regarding Mr. Graham's conduct during the ITL transaction.  Accordingly,

8   the court grants a Rule 56(f) continuance with respect to Mr. Graham's defamation and false

9   light invasion of privacy claims.

10  **I.      The Court Reserves Ruling on Mr. Graham's Declaratory Judgment Claim.**

11          Mr. Graham seeks a declaration pursuant to 28 U.S.C. § 2201(a) that he is entitled to the

12  $1 million "signing bonus" paid by Siva pursuant to his employment agreement.  Cingular

13  counters that, based on Mr. Graham's breach of his common law duties of loyalty and

14  disclosure to his employer, it is Cingular that is entitled to the $1 million signing bonus.

15  Cingular asserts that the $1 million signing bonus is a benefit that was conferred upon Mr.

16  Graham because he breached his duties to Cingular.  This appears to be the overarching reason

17  for the parties' dispute in this matter:  that is, who is entitled to the $1 million signing bonus.

18          Declaratory judgment actions are justiciable if "there is a substantial controversy,

19  between parties having adverse legal interests, of sufficient immediacy and reality to warrant

20  the issuance of a declaratory judgment."  Nat'l Basketball Ass'n v. SDC Basketball Club, 815

21  F.2d 562, 565 (9th Cir. 1987) (citations omitted).  In light of Cingular's threats that it would

22  freeze Mr. Graham's personal bank accounts if he did not relinquish control over his signing

23  bonus, Mr. Graham properly brings a claim for declaratory relief before this court.  Cingular,

24  however, counterclaimed against Mr. Graham alleging breach of agency, unjust enrichment,

25

26  ORDER- 23

1   and recovery of compensation and/or benefits.  As damages, Cingular claims an entitlement to

2   the $1 million signing bonus.

3        The court may use its discretion to determine whether declaratory relief is "appropriate"

4   when other adequate remedies are available.  Fed. R. Civ. P. 57.  When declaratory relief and

5   another remedy are substantially similar, the court may exercise its discretion to dismiss the

6   declaratory judgment claim.  Newton v. State Farm Fire & Casualty Co., 138 F.R.D. 76, 79

7   (E.D. Va. 1991).  Here, Mr. Graham voluntarily placed his signing bonus in escrow and then

8   sought a declaration that he did not violate any fiduciary duties to Cingular and is entitled to the

9   bonus.  Cingular counterclaimed that Mr. Graham violated his duties to it so it should be

10  entitled to the money.  Although there is an alternative procedure for determining this dispute,

11  i.e., Cingular's counterclaims, the court declines to use its discretion to dismiss Mr. Graham's

12  action for declaratory judgment based on the court's interest in ensuring that the rights to the

13  signing bonus are determined properly.

14  **IV.  CONCLUSION**

15       For the reasons stated above, the court GRANTS Cingular's motion for summary

16  judgment in part and DENIES it in part (Dkt. # 48).  The court GRANTS Plaintiff's motion for

17  a Rule 56(f) continuance with respect to his claims for defamation and false light invasion of

18  privacy.

19       Dated this 3rd day of January, 2007.

20

21

22                           JAMES L. ROBART

23                           United States District Judge

24

25

26  ORDER- 24